Argued and submitted May 30, reversed and remanded for new trial
September 6, 2006

# STATE OF OREGON,
*Respondent,*

*v.*

# DARIN FORBES CAMPBELL,
*Appellant.*

## C032211CR; A125348

142 P3d 517

Jamesa J. Drake, Deputy Public Defender, argued the cause for appellant. With her on the brief were Peter A. Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Robert M. Atkinson, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Schuman and Ortega,* Judges.

SCHUMAN, J.

* Oretga, J., *vice* Richardson, S. J.

**SCHUMAN, J.**

Defendant appeals his conviction for unlawful possession of a controlled substance, *former* ORS 475.992 (2003), *renumbered as* ORS 475.840 (2005), assigning error to the trial court's denial of his motion to suppress evidence obtained after he consented to a search. On appeal, the issues are whether defendant was stopped at the time he consented; if so, whether the stop was unlawful; and, if so, whether the evidence must be suppressed as the fruits of that unlawful stop. We conclude that defendant was stopped, the stop was unlawful, and the evidence should have been suppressed. We therefore reverse and remand.

We take the following facts from the trial court's findings and undisputed testimony in the record. On August 15, 2003, at around 2:30 a.m., a Washington County sheriff's deputy driving a marked patrol car saw defendant walking along a highway. Because defendant looked "out of place," the deputy turned the patrol car around and, without turning on the overhead light, parked behind him. As the deputy was stepping out of the car, defendant stopped walking and took his wallet out of his pocket. When the deputy approached, defendant handed over his driver's license without having been asked to do so. The deputy then "ran [the license] through dispatch" and learned that defendant was "clear." He did not return the license.[1]

Either while the deputy was waiting to hear whether defendant was "clear" or shortly thereafter, the deputy noticed a bulge in the waistband of defendant's shorts and asked him what it was. Defendant replied that it was suntan oil. The deputy asked defendant for permission to pat him down, and defendant replied, "Yeah, go ahead." The object in the waistband turned out to be suntan oil, but the deputy continued the patdown until he felt two cylindrical objects in defendant's pockets. He asked defendant to identify those objects as well; defendant said they were pens, and,

---

[1] The deputy could not recall when, if ever, he returned the license to defendant. The trial court found, based on the state's failure to prove that the deputy returned the license, that he retained it throughout the encounter. The state does not dispute that finding.

when the deputy asked for permission to remove them from the pocket, defendant once again replied, "Yeah, go ahead." One of the objects was a clear pen barrel containing a white powdery substance that the deputy suspected was contraband. When questioned, defendant first claimed that he had picked the pens up at a public transit stop and did not know what they contained. Upon further questioning, however, he admitted that the pens contained cocaine. The deputy then arrested defendant and gave him *Miranda* warnings. The substance was, in fact, cocaine.

In a pretrial motion, defendant sought suppression of the cocaine and of his statements to the deputy. Relying on Article I, section 9, of the Oregon Constitution and the Fourth and Fourteenth Amendments to the United States Constitution, he contended that the deputy had stopped him, thereby effecting a seizure of his person; that, at the time of the seizure, the deputy had no reasonable suspicion of criminal activity, thereby rendering the seizure unlawful; and that the drugs and statements were the fruits of that unlawful seizure and should be suppressed. The trial court denied the motion, concluding that defendant's encounter with the deputy did not amount to a stop and therefore did not trigger the constitutional protections against unlawful seizures.

An encounter between a law enforcement officer and a person is a seizure, and for that reason subject to the limitations of Article I, section 9, of the Oregon Constitution,

"(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable in the circumstances.

"* * * * *

"[T]he encounter is a 'seizure' of a person only if the officer engages in conduct significantly beyond that accepted in ordinary social intercourse. The pivotal factor is whether the officer, even if making inquiries a private citizen would not, has otherwise conducted himself in a manner that would be perceived as a nonoffensive contact if it had occurred between two ordinary citizens."

*State v. Holmes*, 311 Or 400, 409-10, 813 P2d 28 (1991) (footnote omitted). This court and the Supreme Court have held repeatedly that, when a police officer holds a person's driver's license while checking for outstanding warrants or for some other investigatory purpose, the person is seized under Article I, section 9, because in that situation the person reasonably believes that his or her freedom of movement has been intentionally and significantly impaired. *E.g., State v. Painter*, 296 Or 422, 425, 676 P2d 309 (1984); *State v. Harper*, 197 Or App 221, 235, 105 P3d 883 (2005) (citing cases). The fact that, in this case, defendant spontaneously proffered his license without having been asked for it is of no constitutional significance. The crucial aspect of an encounter that makes it a seizure—a defendant's reasonable belief that he or she is not free to leave the scene—derives not from the consensual nature of the encounter's origin but from the defendant's perceived inability to leave once the encounter is underway and an investigation has begun. *Painter*, 296 Or at 425 (when "officer retained defendant's license and credit cards" defendant "was, in fact, unable to leave"); *Harper*, 197 Or App at 235 (nature of a noncoercive, consensual encounter "changed" into a stop when officer retained defendant's identification because that act "restrains the person from leaving"). Thus, once the deputy accepted defendant's license and began to investigate, the encounter was a stop, regardless of what it was before that.

■ Furthermore, it was an unlawful stop because the deputy did not have a reasonable suspicion that criminal activity was occurring or about to occur. ORS 131.615(1) ("stop" is lawful if officer "reasonably suspects that a person has committed or is about to commit a crime"). The deputy stopped defendant because defendant "just kind of looked out of place." That is not reasonable suspicion, and the state does not argue that it is; reasonable suspicion arises when an officer "is able to point to specific and articulable facts which give rise to the inference that criminal activity is afoot." *State v. Valdez*, 277 Or 621, 629, 561 P2d 1006 (1977).

■ Thus, at the time the deputy asked defendant for consent to conduct a patdown, defendant was being subjected to an unlawful seizure. Further, the deputy would not have obtained consent "but for" the unlawful stop. Those facts

alone, however, do not necessarily mean that evidence found as a result of the consent must be suppressed. If the state can "prove that the defendant's consent was independent of, or only tenuously related to, the unlawful police conduct," then evidence that would not have been discovered but for the illegality is nonetheless admissible. *State v. Hall*, 339 Or 7, 35, 115 P3d 908 (2005). Various facts in a particular case may be relevant to the question whether the connection between the consent and the unlawful conduct is too tenuous to support suppression, for example,

> "(1) the temporal proximity between the unlawful police conduct and the defendant's consent, (2) the existence of any intervening circumstances, and (3) the presence of any circumstances—such as, for example, a police officer informing the defendant of the right to refuse consent—that mitigated the effect of the unlawful police conduct."

*Id.* The state argues that, in the present case, the fact that defendant voluntarily offered his identification to the deputy is such an "intervening circumstance," citing *State v. Kennedy*, 290 Or 493, 624 P2d 93 (1981), and *State v. Rodriguez*, 317 Or 27, 854 P2d 399 (1993), as those cases were discussed in *Hall*, 339 Or at 30-32.

We disagree. *Hall* teaches only that, under *Kennedy* and *Rodriguez*, when a defendant "volunteer[s] to allow a search without any police prompting," the connection between prior illegality and consent is attenuated. *Hall*, 339 Or at 34. In this case, however, defendant did not volunteer to be searched; the undisputed testimony of the deputy is that defendant consented ("Yeah, go ahead") only after the deputy "asked him if he would allow me to pat him down." Nor is there any evidence that, by voluntarily giving his license to the deputy, he was implicitly consenting to all of the interactions with the deputy that occurred thereafter. Any attenuating influence that voluntariness might have exerted in this case dissipated once the deputy retained defendant's license and defendant was no longer free to leave. *See Painter*, 296 Or at 425; *Harper*, 197 Or App at 235.

The evidence that defendant sought to suppress derived from his consent to be patted down. That consent would not have occurred but for the fact that defendant, at

the time he rendered it, was being unlawfully detained, nor was the nexus between the unlawful detention and defendant's consent sufficiently attenuated to eradicate the effect that the former had on the latter. The trial court should have granted defendant's motion to suppress.

Reversed and remanded for new trial.